**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Dante GRASSI, Dominic Santarelli,
Defendants-Appellants.**

No. 85–5403.

United States Court of Appeals,
Eleventh Circuit.

March 13, 1986.

Thomas F. Almon, Miami, Fla., for Grassi.

E. David Rosen, Rosen & Rosen, P.A., Miami, Fla., John B. Anderson, Washington, D.C., for Santarelli.

Stanley Marcus, U.S. Atty., John Phillips, Asst. U.S. Atty., Miami, Fla., Vincent L. Gambale, U.S. Dept. of Justice, Washington, D.C., for U.S.

Before HILL and ANDERSON, Circuit Judges, and TUTTLE, Senior Circuit Judge.

TUTTLE, Senior Circuit Judge:

Appellants Grassi and Santarelli appeal their conviction of violating the Hobbs Act, 18 U.S.C. § 1951 by extorting money from Robert G. Wilson, Richard Gwenn Williams, and Federal Bank and Trust Company, Ltd.

## I. STATEMENT OF THE CASE

In mid-1978, Wilson and Williams organized a tax shelter program for United States citizens. This shelter involved the use of off-shore Bahamian corporations and banks. Although it purported to create tax shelters through the buying and selling of T-bills and Ginny Mae mortgages through a trader named Charles Tritt, Wilson, Williams, and Tritt had no intention of actually trading, but merely set up paper transactions to give the appearance of a legitimate operation through an entity in the Bahamas entitled the Federal Bank and Trust Company, Ltd. This tax shelter is the subject of an independent indictment.

Initially, the shelter was faltering because of a lack of funds and corporate entities. Wilson then turned for help to appellant Santarelli who lived in Wilson's Ft. Lauderdale neighborhood and who had loaned him money on other occasions.

Santarelli loaned Wilson an undisclosed amount of money and introduced him and Williams to several people in the Bahamas who helped them to set up corporations involved in the tax shelter scheme. One such Bahamian was Clement Pinder. Through Pinder, Wilson and Williams arranged for a Bahamian accounting firm to "audit" bogus confirmation slips and for an offshore trust company to be a conduit for the fees for the sale of phoney tax losses.

In late 1978, the tax shelter began to generate a large amount of cash and by January 1979, Wilson had repaid the loan to Santarelli. As a result of the venture's success, Wilson and Williams began looking into various other investments in the United States and in the Bahamas. They approached Clement Pinder about the prospect of establishing a lottery in the Bahamas.

Appellant Santarelli found out about this meeting with Pinder in March 1979 when he had drinks with Charles Tritt and one of Tritt's companions at the Brittania Beach Hotel in Nassau, Bahamas. Santarelli became upset that Wilson and Williams had contacted Pinder about establishing a national lottery without first consulting him. He felt they should have asked whether he was interested and that their approaching Pinder was an improper use of his introduction. Santarelli stated, "I'm going to go upstairs and call Florida and tell those two bastards to get over here for a meeting."

Shortly thereafter, appellant Grassi, who lived a short distance from Wilson in Ft. Lauderdale, telephoned Wilson and told him and Williams to come to his apartment. At this time, Wilson and his wife were having dinner with Williams and his female companion. Wilson and Williams left immediately to go to appellant Grassi's apartment.

At Grassi's apartment, Grassi told Wilson and Williams that Santarelli was upset about their attempt to set up a lottery program with the use of Santarelli's contacts in the Bahamas without telling him.

Williams noted that the money borrowed from Santarelli by Wilson had been repaid with interest and that he felt no need to consult him. Grassi then slapped Williams twice and stated, "You got to show respect." Wilson stepped between the two men, stating that Williams should leave matters to him and that they would meet with Santarelli in the Bahamas two days later. Later that night, Williams told his female companion that he and Wilson had gone to see Mafia people and that Mrs. Wilson had told him that Wilson had been very upset after returning from Grassi's apartment and that Wilson had cried.

On the second day thereafter, Wilson and Williams flew to the Bahamas to meet with Santarelli. Grassi was present during the meeting but did not participate in the discussions. Santarelli explained that Wilson and Williams should have consulted him before they approached his friend Pinder about the lottery venture. He stated that they "had made him look like a fool with his people in the Bahamas, and that he was going to take a piece of the Bank." At that point, Williams asked if Santarelli was taking 5% of the tax shelter scheme. Santarelli jabbed his finger into Williams' chest and said, "No. I'm taking one-third." Williams then began to argue, at which point Wilson again intervened and took him into the next room. Out of the presence of Santarelli and Grassi, the following conversation took place as testified to by Williams:

Q. State what was said, sir.

A. Well, Bob took me into the other room and said, "Look, let me handle this."

I said, "Bob, what are you talking about? You're talking about somebody taking a whole one-third of the bank," and I said, "We're going [sic] all the work."

I said, "You know, it just doesn't seem fair to me."

He said, "Look you know, they were there when we wanted them. I got my money when I needed it. They helped us with the people that needed to be got at in Nassau, set up the trust company and everything else."

He said, "Let me handle it. Let me work it out."

I said, "Well, I think that a third is just too much."

I said, "You know, okay, maybe for that we ought to give away, maybe, ten percent, I don't know, but a third sounds like one hell of a lot to me."

So, he said, "Well, look, I don't know about you, but I got kids and I don't intend to argue."

So, he said, "I"—he said, "You don't argue with people like this. If they say they want a third, they're going to take a third and what the hell are you going to do about it."

So, I didn't do anything about it.

Q. What did you say?

A. I said, "Well, if you really think that's true, then I guess I've got to go along with what you say."

Wilson and Williams returned to the room and told Santarelli that they were agreeable to his having that percentage. They shook hands, and Santarelli apologized for what had happened at Grassi's apartment.

Upon leaving the suite, Wilson and Williams proceeded to Tritt's room where the three discussed various ways in which they could reduce the net profit figure that would be shown in the company in order to lessen the share that Santarelli would receive. Wilson decided that they had better not do this because Santarelli would find out about it and they would have "nothing but problems." He said to Tritt and Williams: "Just let it go. We'll pay the money."

Shortly after this meeting, Santarelli told Tritt that he had "straightened" Wilson and Williams out and that he was taking a third of their profits, and that Williams "was a little rambunctious and that he had slapped him in the mouth once or twice."

Santarelli also told another person, McKinney, that "he was very upset with Mr. Wilson, that he had to slap him to remind him who was in charge" and that "that was a way he could get respect from him."

Subsequently, Williams testified that in early 1980, he caused approximately 1.4 million dollars to be transferred into a Bahamian corporation owned and controlled by Santarelli as payment of his share of the program's 1979 profits. Additionally, over objection, the government introduced evidence that Santarelli received approximately $200,000 through investments Wilson and Williams made in a company known as Casino Records. Finally, Williams testified that Wilson said that Santarelli requested them to invest approximately $250,000 in a night club in Miami, Casino de Paris.

## II. ISSUES

We conclude that only the following issues merit consideration on this appeal.

1. Whether the evidence is sufficient to support appellants' conviction for violation of the Hobbs Act.

2. Whether the trial court erred in denying appellants' requested jury instruction on the definition of extortion.

3. (a) Whether the district court erred in admitting evidence of appellants' Mafia reputation for the purpose of showing the victims' fear.
(b) Whether the appellants's Sixth Amendment confrontation rights were denied by the method used to prove appellants' Mafia reputation.
(c) Whether evidence of Mafia reputation should have been excluded under Rule 403 F.R.C.P.

4. Whether the district court was clearly erroneous in finding appellant Santarelli's out-of-court statements admissible against appellant Grassi under Federal Rule of Evidence 801(d)(2)(E).

## III. DISCUSSION

(1) *Sufficiency of the Evidence*

■ Appellants cite a number of cases for the proposition that "where the defend-

ant does not threaten the victim, or instill fear, the defendant must, at a minimum, knowingly exploit a fear the victim harbors." *United States v. Haimowitz,* 725 F.2d 1561, 1572 (11th Cir.1984); *United States v. Gerald,* 624 F.2d 1291, 1299 (5th Cir.1980); *United States v. Duhon,* 565 F.2d 345, 351 (5th Cir.1978); *United States v. Russo,* 708 F.2d 209, 214 (6th Cir.1983). They then argue that it would have been impossible for them to exploit Wilson's and Williams' fear because there was no proof that they were aware of this fear.

Appellants argue that the evidence is insufficient to support the convictions because they said and did nothing to create fear in the alleged victims, Wilson and Williams. Santarelli says, for instance, that there is no evidence that he instructed Grassi to slap Williams. Furthermore, Williams testified that Santarelli's jabbing his finger in Williams' chest at the meeting in the Bahamas did not create fear in him. They contend that what induced fear in Williams was the statements made by Wilson that Santarelli had Mafia connections and that Santarelli was not the type of person they should make angry. These statements were made out of the presence of Santarelli, and there is no evidence that Santarelli was aware of these statements having been made.

The first difficulty we find with this argument is that it is plain on the record that a jury could well infer from the conduct of Grassi and Santarelli that they did actually "threaten the victim or instill fear" in the victims themselves. Moreover, the record before us also contains evidence from which the jury could well infer that the appellants actually exploited the alleged victims' fear.

It is plain that there was sufficient evidence to support the trial court's determination that Grassi and Santarelli were engaged in a common enterprise and that, therefore, the acts of one could be attributed by the jury to the other. *United States v. James,* 590 F.2d 575 (5th Cir.

1979). We are presented with the following scenario: When Santarelli learned of Wilson's and Williams' discussions with his contact, Pinder, he stated: "I'm going to go upstairs and call Florida and *tell* those two bastards *to get* over here for a meeting." (Emphasis supplied.) Immediately thereafter, Grassi, who lived a short distance from Wilson in Ft. Lauderdale, telephoned Wilson and told him and Williams to come to his apartment. They left a party and went immediately to Grassi's apartment. There, Grassi told them that Santarelli was upset about their using Santarelli's connections in the Bahamas without telling him. Williams attempted to argue and Grassi then slapped him a couple of times hard enough to raise welts and bruises on his face, saying, "you got to show respect." Wilson intervened to prevent Williams from engaging in a fight and persuaded Williams to agree to go to the Bahamas to see Santarelli two days later, which they did.

From the meeting at Grassi's apartment, and from what other facts Wilson knew of Grassi and/or Santarelli[1], all of whom lived in the same neighborhood in Ft. Lauderdale, Wilson was convinced, and stated to his wife, that they had been with Mafia people, following which he broke down and cried.

Moreover, there is ample evidence from which the jury could find the defendants both exploited the alleged victims' fear. There is no question but that Wilson's fear was apparent the night of his meeting with Grassi. This was later exploited when, in response to Grassi's demand they flew to the Bahamas two days later to meet Santarelli. There, Grassi, who had already slapped Williams and told him to "show respect" was in the room when Santarelli made his statement that he was *"taking"* a third of the business. Neither appellants nor the United States calls our attention to any place in the record where there was evidence that Santarelli had either slapped Williams or Wilson. When Santarelli thereafter told Tritt that he had done so, it is not clear whether he had at some time slapped Williams and/or Wilson himself or whether he was merely adopting the action of Grassi as his own. He said that Williams "was a little rambunctious and that he had slapped him in the mouth once or twice" and made the further statement that "he was very upset with Mr. Wilson, and that he had to slap him to remind him who was in charge" and that "that was a way he could get respect from him." There could be no question but that the jury could infer that such conduct by Santarelli and Grassi exploited the fear that had already been created at least in Wilson's mind.

Although it is true that Williams testified that the occurrence in Grassi's apartment did not scare him, since he was accustomed to looking out for himself, there was ample evidence that the conduct by Grassi and Santarelli together, before Williams agreed to surrender one-third of the business, created and exploited fear in him to resist Santarelli's demand.[2]

With respect to Grassi's separate argument as to the sufficiency of the evidence, we agree with the government's contention that Grassi's part in setting up the scheme in the Bahamas, after himself acting like a

---

**1.** Among the other facts they knew of Santarelli was the fact that they had borrowed start-up money for their tax scheme and had paid it back with interest and that Santarelli was reported to be "loan-sharking" and reported to have "underworld" connections.

**2.** As to the state of Williams' mind in surrendering payments to Santarelli, there is the following testimony:

Q. Why did you consent to make the transfer, the initial $50,000 transfer, to Casino de Paris?

A. Same reason that I consented to Mr. Santarelli becoming a one-third partner in the Federal Bank and Trust?

Q. What was that reason?

A. That I had little choice in the matter.

Q. Why?

A. Because I felt that if I did not agree, that it might be extremely dangerous for me not to.

gangster, slapping Williams and telling him that he had to "show respect"[3] made him at least an aider or abettor in Santarelli's crime.

### (2) Jury Instruction on Extortion

■ The trial judge gave the following jury instructions:

The defendant can be found guilty of that offense only if all of the following facts are proved beyond a reasonable doubt:

First, that the defendant induced the person described in the indictment to part with property;

Second, that the *defendant did so knowingly and willingly by means of extortion*, as hereinafter defined; and

Third, that the extortionate transaction delayed, interrupted or adversely affected interstate commerce.

"Extortion" means to obtain property from someone else with his consent, but whose consent is brought about or induced by the wrongful use of actual or threatened force, violence, or fear.

The term "property" includes not only money and other tangible things of value, but also includes any intangible right considered as a source or element of income or wealth.

The term "fear" means a state of anxious concern, alarm or apprehension of harm, and it includes fear of economic loss as well as fear of physical violence.

The term "wrongful" means to obtain property unfairly and unjustly by one having no lawful claim to it. (Emphasis added.)

Appellants moved the court to modify the jury instruction by defining extortion to read: "Extortion means to obtain property from someone else with his consent, but whose consent is brought about by [a defendant's] wrongful use of actual threat-

ened force, violence, or fear." (Bracketed words not in instruction given to jury). Appellants argue that under the instruction given, it was possible for a jury to find appellants guilty even if they believed the defendants themselves never exploited their alleged Mafia reputation. They contend that even if the jury instruction was proper, the trial court erred by refusing to give the instruction as a theory of the defense.

We find no merit in this claim. The court charged that in order for the jury to find him guilty, they would have to find beyond a reasonable doubt that the defendant induced the person described in the indictment to part with property knowingly and willingly *by means of extortion*, "as hereinafter defined"; then the definition of extortion merely describes the meaning of extortion. It is clear that the court charged that the inducing by the wrongful use of actual or threatened force, violence or fear must be by the defendants. The fact that this must have been done by the defendant is amply covered by the part of the charge stating what the defendants must knowingly and willingly have done. The court's charge made it perfectly clear that the act of extortion must have been done by these defendants. Such a charge also clearly satisfied the requirement that the jury must be charged as to the defendant's theory that they were not responsible. It told them that the illegal acts of threat or exploitation must be acts of these defendants and not of anyone else.

### (3) Evidence of Mafia Reputation

■ (a) The district court admitted over objection out-of-court statements by Wilson concerning his fear of appellants in his belief that they were "loan sharks" and connected with the mob or Mafia. Appellants contend that there was no evidence of threats or exploitation. These statements

---

**3.** This term, while possibly not to be taken by judicial notice to be mobster language, seems to us to be such, since the same words were later used by Santarelli, who bragged to other persons of having slapped Williams and Wilson, to make him "show respect."

were introduced through the testimony of Williams and Tritt, on the theory that they showed the alleged victims' state of mind and thus were not hearsay but were admissible under Rule 803(3) F.R.Evid.[4]

As we have already held that there was evidence to show that Santarelli and Grassi intentionally threatened and exploited Wilson's fear, we find no merit in their contention that such evidence was lacking and that the evidence should therefore not have been admitted.

### (b) *The Sixth Amendment Confrontation Issue*

■ Appellants contend that even though the statements above referred to were admissible either as exceptions to the hearsay rule or as not being hearsay, they were denied the rights of confrontation of the witness, Wilson, whom Williams quoted as having made the statements as to the fear induced by the defendants and by their reputation. The trial court told the jury that this evidence was admitted only as evidence of the victims' state of mind. This issue has been discussed in the case of the Court of Appeals for the Fifth Circuit, by which we are bound,[5] *United States v. Hyde*, 448 F.2d 815 (5th Cir.1971), which stated:

The victim's fearful state of mind is a crucial element in proving extortion. The testimony of victims as to what others said to them, and the testimony of others as to what they said to victims is admitted not for the truth of the information in the statements but for the fact that the victim heard them and that they would have tended to produce fear in his mind. As Professor Wigmore has pointed out:

Wherever an utterance is offered to evidence of the *state of mind* which ensued *in another person* in consequence of the utterance, it is obvious that no assertive or testimonial use is sought to be made of it, and the utterance is therefore admissible, so far as the Hearsay rule is concerned. (Emphasis in original.)

Wigmore, Evidence § 1789 (1940). *See Nick v. United States* [122 F.2d 660 (8th Cir.1941)] *supra.* Thus it is no ground for objection that the third person making the statement to the victim is not produced as a witness or even that he is not named. The defendant's right of cross examination is preserved in that he can ask the witness whether he truly heard these fear-producing statements.

It is to be noted that the *Hyde* opinion dealt with the confrontation issue where it stated: "the defendant's right of cross-examination is preserved in that he can ask the witness whether he truly heard these fear-producing statements."

Moreover, the defendant's right of confrontation was further preserved to them in this case, since Wilson had been granted immunity to testify, had been interviewed by the defendants who found him "cooperative" but who then decided not to call him as a witness.

We conclude that the circumstances of this case satisfied the confrontation requirement, which the Supreme Court described as "substantial compliance with the purposes behind the confrontation requirement." *Ohio v. Roberts*, 448 U.S. 56, 69,

---

4. This rule states:
   The following are not excluded by the hearsay rule, even though the declarant is available as a witness:
   . . . .
   (3) *The existing mental, emotional, or physical condition.* A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's will.

5. In *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir.1981) (en banc), this Court adopted as precedent all of the decisions of the former Fifth Circuit decided prior to October 1, 1981.

.100 S.Ct. 2531, 2540, 65 L.Ed.2d 597 (1979), where the Court quoted from *California v. Green*, 399 U.S. 149 at 155, 90 S.Ct. 1930, 1933, 26 L.Ed.2d 489. The production of the witness Wilson and the grant to him of immunity also made it possible for the defendants to examine him to their heart's content if they had chosen to do so.

■ (c) We also conclude that there is no merit in Santarelli's contention that this evidence should have been excluded under Rule 403 because of its highly prejudicial nature and low probative value.[6] This Court's consistent holdings that Rule 403 is an extraordinary remedy to be used sparingly because it permits the trial court to exclude otherwise relevant evidence, is best stated in *United States v. Meester*, 762 F.2d 867, 985 (11th Cir.1985):

> The United States Court of Appeals for the Fifth Circuit stated in *United States v. McRae*, 593 F.2d 700 (5th Cir.), *cert. denied*, 444 U.S. 862, 100 S.Ct. 128, 62 L.Ed.2d 83 (1979)[5] that:
>
>> Relevant evidence is inherently prejudicial; but it is only *unfair* prejudice, *substantially* outweighing probative value, which permits exclusion of relevant matter under Rule 403. Unless trials are to be conducted on scenarios, on unreal facts tailored and sanitized for the occasion, the application of Rule 403 must be cautious and sparing. Its major function is limited to excluding matter of scant or cumulative probative force, dragged in by the heels for the sake of its prejudicial effect. As to such, Rule 403 is meant to relax the iron rule of relevance, to permit the trial judge to preserve the fairness of the proceedings by exclusion despite its relevance. It is not designed to permit the court to "even out" the weight of the evidence, to mitigate a crime, or to make a contest where there is little or none.

**6.** Federal Rule of Evidence 403 states:
Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice,

[5] In *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir.1981) (en banc), this court adopted as precedent all decisions of the former Fifth Circuit decided prior to October 1, 1981.

*Id.* at 707 (emphasis in original.)

762 F.2d at 875.

The standard of review of such refusal of the trial court to exclude evidence under Section 403 is abuse of discretion. We do not find that the trial court here abused its discretion in refusing to exclude this evidence.

**(4) *Santarelli's Out-of-Court Statements as Admissible Against Grassi Under Federal Rule of Evidence 801(d)(2)(E)***

This Rule provides:

> A statement is not hearsay if—
>
> (2) The statement is offered against a party and is ... a statement by a co-conspirator of a party during and in furtherance of the conspiracy.

■ We have already decided that there was sufficient evidence from which the jury could decide that Grassi and Santarelli were engaged in a conspiracy under *James*. As pointed out by the government, the statements objected to by Grassi were in furtherance of the conspiracy, because from these statements a jury could well infer that they were made for the purpose of further threatening or exploiting existing fears of the victims.

## IV. CONCLUSION

The judgments of conviction and sentences are AFFIRMED.

confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.