[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
MARCH 31, 2009
THOMAS K. KAHN
CLERK

_____

Nos. 06-14607 & 07-10009

_____

D. C. Docket No. 06-60023-CR-WPD

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

ALEXANDER BORNSCHEUER,

Defendant-Appellant.

_____

Appeals from the United States District Court
for the Southern District of Florida

_____

(March 31, 2009)

Before TJOFLAT, MARCUS and WILSON, Circuit Judges.

TJOFLAT, Circuit Judge:

This case involves prosecutions under the Hobbs Act, 18 U.S.C. § 1951, for extortion, and under the Travel Act, 18 U.S.C. § 1952(a)(3), for traveling from Germany to the United States to carry out the extortion. A jury convicted the defendants as charged. One of them, Alexander Bornscheuer, now appeals, challenging the district court's Hobbs Act instruction to the jury, some of the court's evidentiary rulings, and the denial of his motion for a new trial. We affirm.

I.

At the time of the events that gave rise to this criminal prosecution, Claus Fessler, a German citizen residing in Parkland, Florida, was an entrepreneur who owned and managed "Police Today," a very successful magazine publishing firm based in Germany. In the early 1990s, Alexander Bornscheuer, a German citizen residing in Deerfield Beach, Florida, who was self-described as coming from a wealthy family, astute in business and finance, and an "international playboy," became interested in acquiring Police Today, and purchased the company from Fessler for $1 million. Because Bornscheuer failed to prove himself as an astute businessman, and Fessler wanted the firm's history of success to continue, Fessler repurchased the company from Bornscheuer for $1.5 million. In the meantime, Fessler started a new publishing company, which he incorporated in Florida, called International Publishing Consultants (IPC). The new firm also met with

2

success.  In the mid-1990s, Bornscheuer, along with his associate Reinhard Berkau,[1] purchased Fessler's interest in IPC for $1 million.  Subsequently, Bornscheuer and Berkau purchased the remaining interests in IPC for $4.85 million.

Although Bornscheuer portrayed himself as an independently wealthy businessman, he did not personally have the funds to acquire IPC.  Instead, he and Berkau raised money from outside sources, including family, friends, and other investors.  Among those Bornscheuer successfully courted was Eberhard Wahl, who loaned Bornscheuer $850,000 to assist Bornscheuer in acquiring various assets, including IPC.  To hold and distribute the monies he received from outside sources, Bornscheuer established an offshore bank in Naru, a small island nation located in the Micronesian South Pacific.  Bornscheuer named the bank the "Bank of Newport."

Sometime in 2003, Fessler again formed a Florida corporation called Broward Investors Group (BIG).  Fessler funded the company with $1.2 million.  Bornscheuer approached Fessler and sought to acquire Fessler's interest in BIG.  Fessler agreed to sell his interest to Bornscheuer for $1.2 million.  Because

---

[1]  Berkau was an attorney in Germany who, at the time of the events at issue here, specialized in debt collection.

Bornscheuer lacked the funds to pay the purchase price up front, Fessler and Bornscheuer agreed that Bornscheuer would pay $360,000 at closing,[2] and he would pay $595,000 of the remaining $840,000 by giving Fessler's wife, Susanne, a note and mortgage on his Deerfield Beach residence. The parties would treat the $245,000 balance as an unsecured debt.[3] These business dealings began to sour in 2003 and 2004, when Bornscheuer and Berkau's investors began to demand payment of their loans. At the end of 2004, Bornscheuer and Berkau demanded that Fessler agree to rescind their purchases of IPC (i.e., Fessler's interest) and BIG. They also demanded that he have Susanne cancel the $595,000 mortgage she held on Bornscheuer's residence. When Fessler refused, Berkau said, "You don't understand, Fessler, that my investors are dangerous people. They are of the criminal element. They are the kinds of people who will resort to anything in order to get their money back."

---

[2] The transaction closed without Bornscheuer paying the $360,000.

[3] The record does not indicate whether Bornscheuer gave Fessler an unsecured note for $245,000 or an IOU.

4

The parties attempted to negotiate a settlement, but were unable to reach an agreement. As a result, Bornscheuer sued Fessler in Broward County, Florida,[4] and Berkau sued Fessler for fraud in Germany.[5] Berkau prevailed in the fraud case, obtaining a judgment from the trial court on December 13, 2005.[6] Following the entry of that judgment, Bornscheuer and Berkau, who were in Germany during much of December 2005, asked Fessler to go to the office of the McRae Law Firm[7] in Delray Beach, Florida, on December 19, 2005, to participate in a conference call with them. Bornscheuer told Fessler that the reason for having to

---

[4] Bornscheuer filed, in his name or that of the interested party, three separate lawsuits against Fessler in the Broward County Circuit Court sometime in early 2005. These lawsuits, collectively, sought the following: (1) payment of a past-due loan Bank of Newport had made to Fessler; (2) cancellation of the $360,000 debt Bornscheuer owed Fessler in connection with his purchase of BIG; and (3) cancellation of the mortgage Susanne Fessler held on Bornscheuer's residence.

[5] It appears from the record that the dispute in that case arose, in part, after Bornscheuer and Berkau discovered that Fessler had made misrepresentations concerning Fessler's ownership of a licensing claim that Fessler sold to Berkau in 2000. It turned out that Police Today owned the claim, not Fessler; hence, Berkau acquired nothing in exchange for the money he paid Fessler.

[6] The judgment ordered Fessler to pay Berkau as follows: "US$310,000 plus interests [sic] in an amount of US$213,667.74 as well as additional interests [sic] in an amount of 5 percentage points above the basic interest rate on US$523,667.74 since June 1, 2005."

[7] The McRae Law Firm represented Bornscheuer in the Broward County Circuit Court.

5

participate in the call from the law firm's office was to ensure "a certain degree of privacy and confidentiality" and to prevent him from recording the conversation.[8] The purpose of the call, Bornscheuer said, was to discuss the steps the parties might take in response to the German court's judgment.

The conference call took place as scheduled.[9] During the call, Bornscheuer and Berkau repeated the demand for rescission that they had made twelve months earlier. They said that, unless he complied with their demand, they would (1) continue pressing their lawsuits in the Broward County Circuit Court and in Germany; (2) have the German authorities bring criminal charges against him for fraud; and (3) report him, his wife, and his three children to the federal immigration authorities for violating the conditions of their visas, which could result in their deportation. Bornscheuer and Berkau also reminded Fessler that their investors were dangerous people and that if he did not meet their demand, they could not guarantee his or his family's safety.

---

[8] Bornscheuer made certain that an employee of the law firm would be present during the call to ensure that Fessler did not record it.

[9] A law firm employee sat with Fessler during the phone call and ensured that he did not record the conversation. The conversation lasted approximately 20 minutes. The employee did not speak German and thus did not understand what was said.

Bornscheuer returned to the United States sometime around Christmas of 2005, and, on December 28, he had Fessler meet him at his Deerfield Beach home. There, Bornscheuer repeated his and Berkau's threats of continuing litigation, criminal actions, and deportation. Bornscheuer also mentioned that one of his investors, Eberhard Wahl, was a dangerous underworld figure who would do whatever was necessary to recover his money. Bornscheuer related that Wahl knew where Fessler and his family lived[10] and that he was struggling to hold Wahl at bay pending Fessler's compliance with his and Berkau's demand. Bornscheuer stated that Fessler had to comply by mid-January; otherwise, he and his family would be at grave risk. Bornscheuer noted that Fessler's compliance would include the cancellation of the $360,000 he still owed for the purchase of BIG; the release of the $595,000 mortgage Susanne held on his residence; and a payment of $1 million in U.S. currency.

Fearing that he and his family were in grave danger, Fessler immediately contacted the FBI. After he met with Special Agents William Schureck and Donald VanHoose, the FBI began investigating Bornscheuer and his associates. The FBI instructed Fessler to record all future conversations with Bornscheuer, and Berkau, and to agree to any demands they made.

---

[10] Bornscheuer told Fessler that Wahl had driven past Fessler's house.

Fessler spoke with Bornscheuer by telephone on January 2, 2006, and they scheduled a meeting for January 14, 2006, at which Fessler would close the rescission of the IPC and BIG transactions in accordance with Bornscheuer and Berkau's demand. The following parties were to attend the meeting: Bornscheuer, Berkau, Claus and Susanne Fessler, and Claus's attorney in Germany, Hartmut Mertin. Following their telephone conversation, Bornscheuer sent Fessler a fax, which memorialized the terms of the closing. The fax stated:

> There is agreement [sic] that the conversation that will take place on January 14th should not end in a Turkish bazaar. In other words, the settlement amount we are striving for in the amount of one million U.S. dollars is not subject of the negotiations [sic]. Rather, the subject of the negotiations is the how, that is, how the non-cash portion of the settlement amount could be provided.

The fax further listed several points of agreement, including: (1) Susanne Fessler's cancellation of the $595,000 mortgage; (2) Fessler's liquidation of the companies which he owned;[11] (3) the dismissal of lawsuits pending in the Broward County Circuit Court and in Germany; and (4) the disassociation of the parties "from all possible future adverse actions."

On January 4, Fessler and Bornscheuer again met at Bornscheuer's home, this time to discuss the contents of the fax. As the FBI instructed, Fessler recorded

---

[11] The record does not identify the companies that would be affected by this agreement.

8

the conversation. The two men went over the terms of the settlement and discussed a criminal complaint that had been filed against Fessler in Germany. Fessler asked what Bornscheuer meant by the words "possible future adverse actions." Bornscheuer responded,

> that is naturally expressed obscurely, with all intentions very obscure. You know very well that I can't write something here, in black and white, something that could possibly be laid out as coercion. That's clear, you know very well what is meant with that. What is meant is that you don't do anything that could harm us, and that we neither go after your [U.S. immigration] visa, nor conduct criminal proceedings.

Fessler and Bornscheuer also talked about Wahl. Bornscheuer reminded Fessler of Wahl's background and went into some detail about the violent methods Wahl used to collect rent from deadbeat tenants in Germany. Fessler asked Bornscheuer whether any harm would come to him or his family, and Bornscheuer replied that he and Fessler were both chess players and that Fessler knew that he could not answer that question.

On January 6, Bornscheuer telephoned Fessler. Fessler tape-recorded the call. Bornscheuer told him that they had to close by the end of the month; otherwise, it would be "total war" and Bornscheuer could not "stop anything." On January 9, Bornscheuer called Fessler again. As recorded, Bornscheuer told

Fessler that he had spoken with Wahl and Wahl had agreed that he would "ne'er darken Fessler's door" in exchange for $500,000.

On January 14, the parties—Bornscheuer, Berkau, the Fesslers, and Mertin—met, as scheduled, at Bornscheuer's house.[12] They discussed the terms of the fax Bornscheuer had sent Fessler, and Bornscheuer reiterated that the terms were non-negotiable. Berkau also advised Fessler that, if the parties failed to reach a settlement, Fessler would be subject to criminal action. Mertin urged Fessler to reject the settlement proposal. However, in accordance with the FBI's instructions to agree to any demands made on him, Fessler rejected Mertin's counsel. He then asked Mertin to leave the meeting and to wait outside in the car.

After Mertin left, Berkau reminded Fessler that dangerous people were putting pressure on him for payment and that he was doing all he could to restrain them from harming the Fesslers. Bornscheuer also suggested that Fessler use an office building he owned as collateral for the settlement amounts.[13] The office building was estimated to be worth $2 million. Also, as for Wahl, Bornscheuer

---

[12] Claus Fessler came to the meeting armed with a tape recorder.

[13] The tape recording of the meeting does not indicate whether Fessler was to use the building as collateral for a bank loan or to secure a note he would give Bornscheuer and Berkau. Because Fessler deeded the building to Bornscheuer, our inference is that the building was not used as collateral.

would pay Wahl $500,000 from the $1 million Fessler had agreed to pay Bornscheuer and Berkau. Bornscheuer assured the Fesslers that this would keep Wahl from doing anything to harm them or their children.

Wanting to hear direct assurances from Wahl, Fessler asked Bornscheuer to place a telephone call to Wahl. Bornscheuer agreed and called Wahl. He used a speaker phone so the Fesslers could speak directly to Wahl. Wahl assured the Fesslers that, if they settled, they would have nothing to fear. Fessler asked Wahl whether his family would be harmed if he did not settle; Wahl's answer was that he believed a settlement would be reached. Bornscheuer interjected that what Wahl might do if Fessler refused to settle could not be discussed over the telephone.

Later in the day, Bornscheuer emailed Steve Goerke, an attorney with the McRae Law Firm, the terms of the verbal agreement the parties had reached at the meeting. The terms were as follows: (1) Susanne would release the $595,000 mortgage she held on Bornscheuer's home; (2) all legal actions would be dismissed, and there would be no future legal actions between the parties; (3) Fessler would transfer ownership of the office building he owned to Bornscheuer, with Bornscheuer assuming the existing mortgage of approximately $1,165,000; (4) the note reflecting Bornscheuer's $360,000 debt to BIG would be cancelled;

11

(5) neither Bornscheuer nor Fessler would seek attorney's fees in the litigation pending in the Broward County Circuit Court; and (6) Fessler would pay Berkau between $400,000 and $520,000 in cash.[14]

## II.

On January 26, 2006, a Southern District of Florida grand jury handed down a four-count indictment against Bornscheuer, Berkau, and Wahl. Count 1 charged them with conspiring from December 2005 through January 14, 2006, in violation of 18 U.S.C. § 371,[15] to extort money and the forgiveness of debts from Claus and Susanne Fessler, in violation of the Hobbs Act, 18 U.S.C. § 1951,[16] and to travel

---

[14] This is the first indication in the record that Fessler would make such a payment. Nothing in the record indicates who would fix the precise amount of the payment.

[15] Section 371 of Title 18 reads:

If two or more persons conspire . . . to commit any offense against the United States . . . and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined under this title or imprisoned not more than 5 years, or both.

[16]The Hobbs Act reads in relevant part:

(a) Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined under this title or imprisoned not more than

in foreign commerce with intent to commit such extortion, in violation of the

Travel Act, 18 U.S.C. § 1952(a)(3).[17]  Count 2 charged the defendants with

twenty years, or both.

(b) As used in this section—

(1) The term "robbery" means the unlawful taking or obtaining of personal property from the person or in the presence of another, against his will, by means of actual or threatened force, or violence, or fear of injury, immediate or future, to his person or property, or property in his custody or possession, or the person or property of a relative or member of his family or of anyone in his company at the time of the taking or obtaining.

(2) The term "extortion" means the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right.

(3) The term "commerce" means commerce within the District of Columbia, or any Territory or Possession of the United States; all commerce between any point in a State, Territory, Possession, or the District of Columbia and any point outside thereof; all commerce between points within the same State through any place outside such State; and all other commerce over which the United States has jurisdiction.

18 U.S.C. § 1951.

[17]  The Travel Act reads in relevant part:

(a) Whoever travels in . . . foreign commerce . . . with intent to—
. . . .

(3) . . . promote, manage, establish, carry on, or facilitate the promotion,  management, establishment, or carrying on, of any

13

extortion, in that they obtained or attempted to obtain property of the Fesslers, with their consent,

> induced by the wrongful use of actual and threatened force, violence and fear, in that defendants did threaten to harm [Claus Fessler], [Susanne Fessler] and their children and take other action if the defendants did not receive monies and the forgiveness of debts from [Claus Fessler], and [Susanne Fessler].

Count 3 charged Bornscheuer, and Count 4 charged Berkau, with traveling in foreign commerce to commit extortion. The defendants pled not guilty and stood trial together.

The trial began on April 3, 2006. The Government's case in chief established the facts we have set out in part I, <u>supra</u>. The defendants called only one witness in their defense, Mitchell McRae, who had previously represented Berkau in a lawsuit and was acting as counsel for Bornscheuer in the cases he had brought against Fessler in the Broward County Circuit Court. He did not hear any

---

> unlawful activity,
>   and thereafter performs or attempts to perform—
>     (A) an act described in paragraph . . . (3) shall be fined under this title,          imprisoned not more than 5 years, or both[.]
>
> (b) . . . 'unlawful activity' means . . . (2) extortion . . . in violation of the laws of the State in which they are committed or of the United States. . . .

18 U.S.C. § 1952.

14

of the conversations that Bornscheuer and Berkau had with Fessler, so his testimony did not touch on any of the conduct that gave rise to the defendants' indictment.

At the close of the evidence, the defendants moved for judgment of acquittal. The district court denied their motion and then conferred with counsel about the jury instructions. The court informed counsel that it planned to give the Eleventh Circuit's Pattern Jury Instruction on the Hobbs Act, which is as follows:

> Title 18, United States Code, Section 1951(a), makes it a Federal crime or offense for anyone to extort something from someone else and in doing so to obstruct, delay or affect commerce or the movement of articles in commerce. The Defendant can be found guilty of that offense only if all of the following facts are proved beyond a reasonable doubt:
>
> First : That the Defendant induced the person described in the indictment to part with property;
>
> Second : That the Defendant did so knowingly and willfully by means of "extortion," as hereafter defined; and
>
> Third : That the extortionate transaction delayed, interrupted or affected commerce.
>
> The term "property" includes not only money and other tangible things of value, but also includes any intangible right considered as a source or element of income or wealth.
>
> Extortion means to obtain property from someone else with that person's consent, but whose consent is brought about or induced by the wrongful use of actual or threatened force, violence or fear.

15

The term "fear" means a state of anxious concern, alarm or apprehension of harm, and it includes <u>fear of economic loss</u> as well as fear of physical violence.

<u>Eleventh Circuit Pattern Jury Instructions</u> (Criminal) 66.1 (2003) (emphasis added).

Bornscheuer and Berkau objected to the two parts of the instruction we have underscored. Their first objection was to the definition of extortion. Although the word "or" appears between "violence" and "fear" in the statutory definition of "extortion," Count 2 of the indictment uses the word "and" instead of "or." They therefore asked the court to insert "and" for "or" in its proposed instruction. The district court summarily overruled the objection. The second objection addressed the inclusion of "fear of economic loss" in the definition of "fear." Bornscheuer and Berkau argued that the phrase "fear of economic loss" should be omitted because the Government, in its opening statement to the jury, took the position that the extortion in this case was based on the Fesslers' fear of physical violence, not a fear of economic loss.[18] The court overruled the defendants' second

_____

[18] The defendants argued that if the court's Hobbs Act instruction included the "fear of economic loss" language, the court would be amending the indictment in contravention of the Fifth Amendment, which states that "[n]o person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury. . . ." U.S. Const. amend V. Bornscheuer repeats this Fifth Amendment argument in his brief. Because it is clear that he was not

16

objection on the ground that the evidence was sufficient for the jury to find that the Fesslers feared economic loss as well as physical violence. The court therefore included the pattern instruction in its charge to the jury.

On April 21, the jury returned its verdicts, finding the defendants guilty on all counts. Post-verdict, the defendants renewed their motions for judgment of acquittal and, alternatively, moved the court for a new trial.[19] The court denied their motions and thereafter sentenced Bornscheuer and Berkau to prison terms of thirty-seven months and Wahl to a prison term of thirty months. Bornscheuer now appeals.[20]

---

convicted of a crime not alleged in the indictment in this case, we confine our discussion to the question of whether the district court erred in instructing the jury as it did, and we do not refer to the Fifth Amendment prohibition against convicting an accused for a crime not presented in the indictment.

[19] The defendants moved for a new trial based on newly discovered evidence, which included the opinion of a German appellate court affirming the trial court's judgment against Fessler and an order of the Broward County Circuit Court denying Fessler's motions for summary judgment in three pending cases. The court denied the motions because these rulings occurred subsequent to the defendants' commission of the charged offenses and, thus, could not have had a bearing on the defendants' intent at that time. As for the other newly discovered evidence, the court found that it was merely cumulative or impeaching and, as such, would not have affected the outcomes of the trial.

[20] Berkau did not appeal. Wahl filed a notice of appeal but abandoned it. On September 27, 2006, we dismissed Wahl's appeal on his motion.

Bornscheuer's appeal challenges the district court's refusal to delete from the jury instruction on the elements of the Hobbs Act the words "fear of economic loss,"[21] evidentiary rulings the court made during the trial, and the court's refusal to grant a new trial. We consider these challenges in order.

III.

A.

The Hobbs Act offense contains two elements: (1) extortion, and (2) interference with interstate commerce. See Stirone v. United States, 361 U.S. 212, 218, 80 S. Ct. 270, 274, 4 L. Ed. 2d 252 (1960); United States v. Kaplan, 171 F.3d 1351, 1354 (11th Cir. 1999). A constituent sub-element of "extortion" is the victim's fearful state of mind. United States v. Grassi, 783 F.2d 1572, 1578 (11th Cir. 1986). In Grassi, we defined "extortion" as obtaining "property from someone else with his consent, but whose consent is brought about or induced by the wrongful use of actual or threatened force, violence, or fear." In doing so, the Grassi court necessarily adopted the following definition of "fear": "'[F]ear' means a state of anxious concern, alarm or apprehension of harm, and it includes

---

[21] Bornscheuer's argument that the court erred in including the "fear of economic loss" wording in its Hobbs Act instruction applies to the Count 1 charge of conspiracy to violate the Hobbs Act as well as the Count 2 charge of a substantive Hobbs Act offense.

18

fear of economic loss as well as fear of physical violence." Id. at 1577 (emphasis added);[22] see United States v. Vallejo, 297 F.3d 1154, 1165 (11th Cir. 2002); accord United States v. Sopher, 362 F.2d 523, 527 (7th Cir.), cert. denied, 385 U.S. 928, 87 S. Ct. 286, 17 L. Ed. 2d 210 (1966); Bianchi v. United States, 219 F.2d 182, 189 (8th Cir.), cert. denied, 349 U.S. 915, 75 S. Ct. 604, 99 L. Ed. 1249 (1955). The jury instruction the district court gave recited these Grassi definitions verbatim.[23] Putting aside the fact that Grassi bound the district court to include the "fear of economic loss" wording in its Hobbs Act instruction—because the evidence clearly supported a finding that the Fesslers were threatened with

---

[22] In Grassi, two businessmen, Wilson and Williams, set up an illegal tax shelter in the Bahamas. The two became entangled with two men who purportedly had ties to the Mafia: Santerelli and Grassi. Santerelli and Grassi became angry when Wilson and Williams left them out of a major deal, and they physically assaulted them and made various thinly-veiled threats to induce them to turn over one-third of any profit made as a result of the venture. See Grassi, 783 F.2d at 1573–74. Although the evidence presented at trial strictly supported a conviction for extortion based on the use of fear of physical violence, we quoted and adopted the district court's use of the following definition of "fear" in its charge to the jury: "'Fear' means a state of anxious concern, alarm or apprehension of harm, and it includes fear of economic loss as well as fear of physical violence." Id. at 1577.

[23] The evidence fully supported the district court's inclusion of the "fear of economic loss" wording in its Hobbs Act instruction; although the threats made to the Fesslers were directed principally to their persons, the threats involved financial consequences as well.

economic loss as well as physical violence—Bornscheuer's argument that the wording does not square with a principled reading of the Hobbs Act rings hollow.

Bornscheuer contends that the meaning of the term "fear," as used in the indictment, must be drawn from its neighboring words—in the statutory interpretation context, we refer to this as noscitur a sociis. According to Bornscheuer, "fear" must be defined, in accordance with the words used in the indictment, as "a state of anxious concern, alarm or apprehension of harm . . . of actual and threatened force [and] violence." Any instruction defining "fear" otherwise, he continues, necessarily amends the indictment. We note, however, that an equally applicable canon of construction exists, namely that all words in a text must be given independent meaning. Cf. United States v. Menasche, 348 U.S. 528, 538–39, 75 S. Ct. 513, 520, 99 L. Ed. 615 (1955) ("The cardinal principle of statutory construction is to save and not to destroy. It is our duty to give effect, if possible, to every clause and word of a statute." (internal quotation marks and citations omitted)); Davis v. Chevy Chase Fin., Ltd., 667 F.2d 160, 170 (D.C. Cir. 1981) (applying the contract law credo that "every word in an agreement should be given meaning"). Under this maxim, if we defined "fear" narrowly as merely pertaining to "actual and threatened force [and] violence," we would strip the term of its independent meaning as assigned by this court in Grassi.

20

Endeavoring to give effect to each term of the indictment, we read Count 2 of the indictment as charging Bornscheuer with illegally obtaining or attempting to obtain property with the consent of the victims "induced by the wrongful use of actual and threatened force, violence and fear." "Fear," as defined in Grassi, means "a state of anxious concern, alarm or apprehension of harm and it includes fear of economic loss as well as fear of physical violence." Grassi, 783 F.2d at 1577. Therefore, the indictment charged Bornscheuer with extortion under theories of physical violence and economic loss. We find further support for this reading in the next clause of Count 2, which states that Bornschuer and his co-defendants "did threaten to harm [Claus and Susanne Fessler] and their children and take other action" if their demands were not met. We read "take other action" as including the commission of acts calculated to cause economic loss. Such a reading of the indictment mirrors the instruction given to the jury—which was consistent with Grassi—and leads us to the conclusion that the court did not err in giving the pattern jury instruction verbatim.

B.

Bornscheuer argues, as he did during the charge conference the district court held prior to counsel's closing arguments, that the court should have excluded the "fear of economic loss" wording from its Hobbs Act instruction

21

because the prosecutor, in his opening statement to the jury at the beginning of the trial, told the jury that the defendants conspired to obtain the Fesslers' property by threatening the Fesslers with physical violence, but not economic loss. In other words, despite the fact that the evidence showed that the defendants' threats, if carried to fruition, would have resulted in economic loss—the expense the Fesslers would necessarily incur in defending criminal and civil lawsuits and undergoing a possible deportation proceeding—the court should have bound the United States to the representation the prosecutor happened to make in his opening statement to the jury. Bornscheuer cites no precedent in support of this argument, and we are aware of none.[24] His argument therefore fails.

IV.

Bornscheuer argues that the district court violated his rights under the Confrontation Clause of the Sixth Amendment by admitting as evidence, through the testimony of Susanne Fessler, statements Claus Fessler made to her describing

---

[24] Bornscheuer's argument suggests, in part, that the district court effectively amended the indictment—in violation of his Fifth Amendment right to be held to answer only on indictment by a grand jury—by authorizing the jury to find against the defendants on a theory the Government had eschewed in opening statement. Bornscheuer cites no authority, and we are aware of none, for the proposition that an indictment must be narrowed to conform to the prosecutor's opening statement to the jury at the commencement of a trial.

22

the threats Bornscheuer had made.[25]  His argument is meritless.  Although his brief contains broad assertions about the Government's use of out-of-court statements that came in through Susanne Fessler's testimony, the brief fails to cite any statement that came in over a hearsay objection.  Perhaps such failure is due to the fact that the majority of the out-of-court statements Susanne Fessler recited were elicited by Bornscheuer's attorney during cross-examination.  Bornscheuer cannot complain here about testimony he elicited.  Ford v. Garcia, 289 F.3d 1283, 1293–94 (11th Cir. 2002); see also United States v. Martinez, 604 F.2d 361, 366 (5th Cir. 1979) ("The accepted rule is that where the injection of allegedly inadmissible evidence is attributable to the action of the defense, its introduction does not constitute reversible error.").[26]

---

[25]  We review a district court's evidentiary rulings for abuse of discretion. Old Chief v. United States, 519 U.S. 172, 174 n.1, 117 S. Ct. 644, 647 n. 1, 136 L. Ed. 2d 574 (1997); United States v. Abel, 469 U.S. 45, 54–55, 105 S. Ct. 465, 470–71, 83 L. Ed. 2d 450 (1984).  "An abuse of discretion arises when the district court's decision rests upon a clearly erroneous finding of fact, an errant conclusion of law or an improper application of law to fact."  United States v. Frazier, 387 F.3d 1244, 1276 n.12 (11th Cir. 2004) (en banc) (Tjoflat, J., specially concurring) (quotations and citations omitted).

[26] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), this Court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to close of business on September 30, 1981.

Bornscheuer's brief cites out-of-court statements other witnesses repeated over a hearsay objection. Most of these statements were either not hearsay or fell within a hearsay exception. For example, during the prosecutor's direct examination of Susanne Fessler, the court overruled Bornscheuer's hearsay objection to the following question:

Q.      Had [Berkau] told you what types of clients he represented?

A.      He told me—he told us about from [sic] the Hell's Angels at one point, that he did represent them.

The district court did not abuse its discretion in admitting the testimony, as such a statement is admissible under Federal Rule of Evidence 801(d)(2)(E) as a statement of a co-conspirator made in furtherance of a conspiracy. See Lucas v. W.W. Grainger, Inc., 257 F.3d 1249, 1256 (11th Cir. 2001) (stating that we may affirm the district court's judgment on any ground that finds support in the record). Furthermore, the answer the question called for was relevant, because the jury could reasonably infer from Berkau's answer, which revealed Berkau's association with a group of people notorious for using violence, that it intimidated Susanne Fessler.[27] In sum, we find nothing in the record to support Bornscheuer's abuse-of-discretion challenges to the district court's evidentiary rulings.

_____

[27] Also, the statement was not offered for the truth of the matter asserted. It was offered to demonstrate the affect it had on Susanne. See Fed. R. Evid. 801(c).

24

Federal Rule of Criminal Procedure 33 provides the district court with discretion to grant a defendant a new trial on the basis of newly discovered evidence "if the interest of justice so requires."  Bornscheuer argues that the district court abused this discretion when it refused to grant his motion for a new trial after reviewing the new evidence he had presented—namely, a German appellate court's opinion affirming a judgment Berkau had obtained against Fessler and the Broward County Circuit Court's order denying Fessler's motions for summary judgment in consolidated cases pending in that court.  To obtain a new trial based on newly discovered evidence, the "movant must demonstrate that the evidence was discovered after trial, that due diligence was shown, and that the evidence was neither cumulative nor impeaching but actually material and likely to produce a new result." United States v. Fernandez, 136 F.3d 1434, 1438 (11th Cir. 1998) (quotation and citation omitted).  Bornscheuer contends that these rulings are relevant to the issue of his state of mind, and thus his intent, during the time he allegedly conspired to commit the Hobbs Act offense.  The district court disagreed, concluding the obvious:  Bornscheuer could not have been thinking

25

about court rulings that had not yet issued.  We likewise disagree.  The district court acted well within its discretion in denying Bornscheuer a new trial.

## VI.

We find no basis in Bornscheuer's arguments for reversing or vacating the district court's judgment and remanding the case for a new trial.  The court's judgment is, accordingly,

AFFIRMED.