[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 18-12418
_____

D.C. Docket No. 1:17-cr-00025-LJA-TQL-1


UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

PAUL DEXTER HARRIS,

Defendant-Appellant.


_____

Appeal from the United States District Court
for the Middle District of Georgia
_____

(February 19, 2019)

Before WILLIAM PRYOR and ROSENBAUM, Circuit Judges, and CONWAY,[*]
District Judge.

WILLIAM PRYOR, Circuit Judge:

---

[*] Honorable Anne C. Conway, United States District Judge for the Middle District of Florida,
sitting by designation.

This criminal appeal presents two questions: first, whether sufficient evidence supports Paul Harris's conviction of extortion in violation of the Hobbs Act, 18 U.S.C. § 1951(a), (b)(2); and second, whether the district court violated Harris's right to present a complete defense when it limited his closing argument. While Harris worked as a corrections officer at Autry State Prison, he discovered that inmates were operating a phone scam in which they posed as government officials and tricked their victims into paying fake fines in the form of prepaid debit-card numbers. Harris confessed to investigators that he seized some of these numbers from the inmates and took the ill-gotten funds for his personal use. Harris cast himself as "Robin Hood" as he took from the inmates, but his actions more closely resemble those of the Sheriff of Nottingham: instead of taking extorted spoils from the rich and returning them to the poor, Harris extorted the scheming inmates to enrich himself. *See generally* Joseph Ritson, *Robin Hood: A Collection of All the Ancient Poems, Songs, and Ballads, Now Extant, Relative to that Celebrated English Outlaw* (Longman et al. 1820) (1795). A jury convicted Harris of extortion by two alternative means: "by wrongful use of actual or threatened force, violence, or fear" and "under color of official right." 18 U.S.C. § 1951(b)(2). And the district court later denied his motion for a judgment of acquittal. We now affirm.

2

## I. BACKGROUND

Inmates at Autry State Prison operated a phone scam in which they would masquerade as law-enforcement or court officials and dupe their victims into paying them for fake infractions. For example, an inmate would tell a victim that he had missed jury duty and would be arrested if he did not pay a fine. Victims paid money to the inmates in the form of Green Dot numbers. Green Dot Corporation sells debit cards that can be reloaded by purchasing a MoneyPak at a store's checkout counter. Each MoneyPak has a unique 14-digit number hidden under a scratch-off field, and this Green Dot number can then be used to load money onto a Green Dot debit card. So when a victim of the scam sent a Green Dot number to inmates, they could use the number to load money onto their Green Dot debit cards over the phone. Inmates were not allowed to have money, including Green Dot numbers, in the prison, so they wrote the numbers on pieces of paper and hid the papers in their cells until they could load the money. The scam succeeded; one inmate collected over $15,000 in Green Dot numbers from his victims.

Paul Harris, a corrections officer at Autry, discovered the inmates' scam. Harris had a reputation as "the asshole" at Autry. He worked on a special team of officers who monitored unruly inmates and conducted surprise "shakedowns"—that is, "a search of the cell or of the inmate." Harris knew that he was obliged to

3

confiscate contraband that he found during the shakedowns. When he conducted shakedowns of the inmates in the summer of 2013, Harris began to find Green Dot numbers. He initially flushed the numbers down a toilet, but an inmate suggested that he should "stop throwing money away like that" and instead "load that money up." So Harris decided, in his words, to "Robin-Hood" the inmates. Harris knew that the inmates had obtained the numbers illegally; he told inmates that "[s]ince you be around stealing[,] . . . I'm a [sic] steal from you." Instead of turning the numbers over to supervisors, Harris loaded the money onto his Green Dot cards. No inmates were reported for possessing contraband, and they continued to operate their scam.

After police departments across the country received numerous complaints about the scam, agents of the Federal Bureau of Investigation traced the scam back to the prison. As part of their investigation, the agents subpoenaed the Green Dot histories for corrections officers, and Harris's Green Dot history raised a red flag.

Harris had two Green Dot cards, the first activated in January 2013 and the second in June 2013. In the summer of 2013, Harris loaded 29 Green Dot numbers onto his cards, and the amount exceeded his income for the time period. His Green Dot numbers had been purchased across the country, including from stores in Georgia, Washington, Florida, Texas, North Carolina, California, Oklahoma, South

4

Carolina, Nebraska, Pennsylvania, and Alaska—almost all places that Harris had never visited.

Agents James Hosty and Brian Davis went to Harris's house unannounced one morning to interview him about his suspicious Green Dot history. Harris changed his story several times. At first, Harris denied having Green Dot cards or using Green Dot numbers. When the agents confronted him with his Green Dot history, Harris then blamed his ex-girlfriend. But Harris eventually confessed that he had taken Green Dot numbers from inmates during shakedowns and loaded the money onto his cards.

A grand jury indicted Harris on one count of Hobbs Act extortion, 18 U.S.C. § 1951(a), (b)(2), by means of either the wrongful use of fear or under color of official right. After a two-day trial, Harris's counsel argued in closing that, although Harris's conduct may have constituted theft, it did not constitute extortion. He provided the definition of common-law theft to the jury and argued that the government charged Harris with the wrong crime. The jury could not reach a verdict, so the district court declared a mistrial.

Before the second trial, the government moved *in limine* to bar Harris from arguing to the jury that he may have committed theft but did not commit extortion. The district court granted the motion. It ruled that Harris could not argue that he "commit[ted] common-law theft or . . . make any type of indication that he should

5

have been charged with something different." But the district court also ruled that Harris could argue that, even if he did something wrong, the government failed to prove that he committed extortion.

At the second trial, Woodrow Tripp, an investigator for the Georgia Department of Corrections, testified about prison policies and the phone scam at Autry. He explained that a "primary responsibility" of corrections officers is to seize contraband from inmates and that officers may not keep contraband for their personal use. The contraband policy in the summer of 2013 required corrections officers to report contraband that they seized, and that report would have triggered a disciplinary hearing for the offending inmate. Tripp explained that, at the hearing, "there is an administrative remedy available to an inmate who believes that his property may have been wrongfully taken by a corrections officer." The discipline for possessing contraband was administrative segregation, commonly referred to as time in "the hole." Tripp testified that, to his knowledge, no inmates had been disciplined for possessing Green Dot numbers and no corrections officers had been reported for taking inmates' Green Dot numbers for their personal use in the summer of 2013. On cross-examination, Tripp testified that he knew nothing about shakedowns conducted by Harris.

Michael Oliver, an inmate involved in the scam when he was at Autry in 2014 and 2015, testified that the "whole prison" was involved in the scam. After

6

one shakedown, Oliver's Green Dot numbers went missing, and someone else had taken the funds. But he never reported the missing Green Dot numbers to prison officials because they were contraband, and he did not want to implicate himself in the scam. On cross-examination, Oliver testified that he was not an inmate at Autry during the summer of 2013, nor did he know Harris.

Agent Hosty testified in detail about his investigation of the phone scam at Autry. He also recounted his interview of Harris. The government then played a recording of Harris's interview for the jury.

At the close of the government's case, Harris moved for a judgment of acquittal. He argued that the government failed to provide sufficient evidence of his guilt, in part because it never identified any victim of his alleged extortion. The district court took the motion under advisement.

During closing argument, Harris's counsel argued that "[w]e're not saying Mr. Harris is not guilty of any crime or that he didn't break any law. He just didn't break this law." He explained that "extortion is not stealing. Extortion is not robbing. It has more elements." The jury was not convinced. It found Harris guilty of extortion both by the wrongful use of fear and under color of official right.

The district court then denied Harris's motion for a judgment of acquittal. Although the government did not identify specific victims of his extortion, the district court concluded that a reasonable jury could find that the inmates had a

7

fearful state of mind when Harris conducted shakedowns. It also concluded that a reasonable jury could find that an understanding existed between Harris and the inmates, in which Harris would not report the inmates for possessing contraband Green Dot numbers and the inmates would not report Harris for keeping the money. The district court sentenced Harris to serve 12 months and one day of imprisonment followed by two years of supervised release.

## II. STANDARDS OF REVIEW

We review *de novo* the sufficiency of the evidence. *United States v. Gonzalez*, 834 F.3d 1206, 1214 (11th Cir. 2016). We view "the evidence in the light most favorable to the jury verdict and draw all inferences in its favor." *Id.* We must affirm the conviction "if there is substantial evidence to support [it], unless no trier of fact could have found guilt beyond a reasonable doubt." *Id.* (internal quotation marks omitted) (quoting *United States v. Pineiro*, 389 F.3d 1359, 1367 (11th Cir. 2004)). Because "[t]he district court has broad discretion over the scope of closing argument," we review a restriction on closing argument for abuse of discretion. *United States v. Gaines*, 690 F.2d 849, 858 (11th Cir. 1982). "Absent a showing of an abuse of discretion the district court will not be reversed for limiting summation as long as the defendant has the opportunity to make all legally tenable arguments that are supported by the facts of the case." *Id.* Although we review a restriction on closing argument for abuse of discretion, we review *de novo*

8

constitutional questions. *United States v. Mitrovic*, 890 F.3d 1217, 1220 (11th Cir. 2018).

## III. DISCUSSION

We divide our discussion in two parts. First, we explain that sufficient evidence supports Harris's conviction of Hobbs Act extortion. Second, we explain that the district court did not violate Harris's right to present a complete defense when it limited his closing argument.

### A. *Sufficient Evidence Supports Harris's Conviction of Hobbs Act Extortion.*

Harris contends that insufficient evidence supports his conviction of Hobbs Act extortion. The Hobbs Act prohibits interference with interstate commerce by robbery or extortion. *See* 18 U.S.C. § 1951(a). Hobbs Act extortion "contains two elements: (1) extortion, and (2) interference with interstate commerce." *United States v. Bornscheuer*, 563 F.3d 1228, 1236 (11th Cir. 2009). Extortion is defined as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." 18 U.S.C. § 1951(b)(2).

Harris raises two arguments that the government failed to prove extortion. First, he argues that the government presented insufficient evidence to support the finding that the inmates consented to his taking of their Green Dot numbers.

9

Second, he argues that the government presented insufficient evidence that he used a requisite means of extortion. Both arguments fail.

### 1. The Government Proved the Inmates' Consent.

Harris first argues that the government failed to prove extortion because insufficient evidence supports the finding that he obtained Green Dot numbers from any inmate "with his consent." At trial, the government argued that inmates consented to give Harris their Green Dot numbers out of either fear or a mutual understanding: an inmate would not report Harris for taking his Green Dot number so that Harris would not report him for possessing contraband. Harris contends that the inmates could not consent because he took their Green Dot numbers during shakedowns that they could not refuse.

Harris's argument misapprehends the nature of consent for the crime of extortion, as reflected by the historical development of that offense. "Extortion is one of the oldest crimes in Anglo-American jurisprudence." *Evans v. United States*, 504 U.S. 255, 278 (1992) (Thomas, J., dissenting); *see also* 3 Edward Coke, *Institutes of the Laws of England* 149 (1644). At common law, the offense concerned public officials who used their office to corruptly obtain money not owed to them. *See* 4 Charles E. Torcia, *Wharton's Criminal Law* § 654 (15th ed. 2018) (collecting cases). Blackstone explained that common-law extortion "is an abuse of public justice, which consists in any officer's unlawfully taking, by colour

10

of his office, from any man, any money or thing of value, that is not due to him, or more than is due, or before it is due." 4 William Blackstone, *Commentaries on the Laws of England* 141 (4th ed. 1770). So "in a large Sense," extortion "signifies any Oppression under Colour of Right," but "in a strict Sense[,] it signifies the Taking of Money by any Officer, by Colour of his Office, either where none at all is due, or not so much is due, or where it is not yet due." 1 William Hawkins, *Treatise of Pleas of the Crown* 170 (2d ed. 1724); *see also* 2 Francis Wharton, *A Treatise on Criminal Law* § 1574, at 373 (8th ed. 1880); 2 Matthew Bacon, *A New Abridgment of the Law* 453 (3d ed. 1768).

As states codified the crime of extortion, they specified two means by which a person may commit extortion, with one means mirroring the common law and the second expanding it beyond public officials to include private individuals. *See, e.g.*, N.Y. Penal Law § 850 (1909). The Field Code, a nineteenth-century model code, defined extortion as "the obtaining of property from another, with his consent, induced by a wrongful use of force or fear, or under color of official right." 4 Commissioners of the Code, Proposed Penal Code of the State of New York § 613 (1865). Extortion "under color of official right" consists of a public official wrongfully using his office to obtain another's property—the common-law definition of extortion. *Evans*, 504 U.S. at 260. Extortion "by a wrongful use of force or fear" consists of either a private individual or public official wrongfully

11

using force or fear to obtain another's property—an expansion of the common-law definition. *Id.* at 264 n.13. To distinguish the crime of robbery from extortion, some statutes specified that "in the former the taking of property must be 'against the will' of the victim, while in the latter the taking must be 'with the consent' of the victim, induced by the other's unlawful threat." Wayne R. LaFave, *Criminal Law* § 20.4, at 1336 (6th ed. 2017); *see also* N.Y. Penal Law § 850.

The meaning of "consent" in extortion statutes derives from this distinction between extortion and robbery. Extortion is "closely related to the crime of robbery, having in fact been created in order to plug a loophole in the robbery law by covering sundry threats which will not do for robbery." LaFave, *Criminal Law* § 20.4, at 1335–36. Common-law robbery required a taking of property from a person by use of force or threatened force. *See* 4 Torcia, *Wharton's Criminal Law* § 454. But this definition embraced only threats of immediate bodily harm to the victim—"doubtless because the severe penalty for robbery, long a capital offense, restrained the courts from expanding robbery to include the acquisition of property by means of other effective threats." LaFave, *Criminal Law* § 20.4, at 1332. The crime of extortion later "evolved to cover other types of intimidation which were apparently viewed as presenting a lesser threat to personal security and thus not requiring the same severe punishment." *Commonwealth v. Froelich*, 326 A.2d 364, 368 (Pa. 1974). Because it requires coercion or intimidation of some sort, extortion

12

is never a truly voluntary transaction. So "in spite of the different expressions" that robbery must be against the victim's will while extortion must be with his consent, "both crimes equally require that the defendant's threats induce the victim to give up his property, something which he would not otherwise have done." LaFave, *Criminal Law* § 20.4, at 1336; *see also Froelich*, 326 A.2d at 368 (opining that "the use of the concept of consent in this context is not necessarily the most informative method of distinguishing between the crimes").

Against this backdrop, Congress in 1946 enacted the Hobbs Act, which codified the federal crime of extortion. 18 U.S.C. § 1951. As state laws had already done, the Hobbs Act adopted both the common-law definition of extortion and the expanded definition that included the wrongful use of fear. *Evans*, 504 U.S. at 261. Congress also followed state laws in distinguishing between robbery and extortion; the Hobbs Act defines robbery as obtaining another's property "against his will" and extortion as obtaining it "with his consent." *Compare* 18 U.S.C. § 1951(b)(1), *with id.* § 1951(b)(2).

The Supreme Court has explained that the term "consent" must be understood according to its historical meaning. "[A]s used in the Hobbs Act, the phrase 'with his consent' is designed to distinguish extortion . . . from robbery." *Ocasio v. United States*, 136 S. Ct. 1423, 1435 (2016). That is, consent for Hobbs

13

Act extortion "simply signifies the taking of property under circumstances falling short of robbery." *Id.*

Harris argues that the inmates did not consent to the extortion because they had no choice in his taking of their Green Dot numbers, but the term "consent" in this context does not connote the degree of voluntariness that Harris suggests. A victim who "grudging[ly]" or "reluctantly" gives up his property to a defendant consents for purposes of the Hobbs Act. *Id.* at 1435–36. Consent does not mean "free of all compulsion." *Froelich*, 326 A.2d at 368. As the Second Circuit has explained, a victim consents to extortion so long as he "retains some degree of choice in whether to comply with the extortionate threat, however much of a Hobson's choice that may be." *United States v. Zhou*, 428 F.3d 361, 371 (2d. Cir. 2005).

Sufficient evidence supports the jury's finding that the inmates consented to Harris taking their Green Dot numbers, without reporting him, so that they would not implicate themselves for possessing contraband or for being involved in the Green Dot scam. Harris confessed to investigators that he took Green Dot numbers from inmates during shakedowns; he explained that, "If I stop somebody walking, [I] shake 'em down" and "say I'm a [sic] load your money up." Harris knew that the inmates obtained the Green Dot numbers illegally. He told the inmates, "[S]ince you being illegal around here, I'm a [sic] take your money from you."

14

Although he initially flushed the numbers down the toilet, Harris decided to keep the money for himself at an inmate's suggestion to "stop throwing money away like that" and to "load that money up," even though he was required to report the possession of contraband. Tripp testified that, to his knowledge, inmates had neither been disciplined for possessing Green Dot numbers nor complained that corrections officers had taken their Green Dot numbers in the summer of 2013. And Oliver, an inmate involved in the scam, testified that he never reported when officers took Green Dot numbers from him because he did not want his participation in the scam to come to light. To be sure, the inmates could not have refused Harris's shakedowns, but they could have reported him for keeping the Green Dot numbers for his personal use. The jury could have reasonably inferred that the inmates grudgingly agreed to keep quiet as Harris took their Green Dot numbers, and their grudging consent is all that is required for extortion.

Sufficient evidence also supports the jury's finding that the inmates consented to Harris's receipt of the Green Dot numbers for his personal benefit. Under the Hobbs Act, "[o]btaining property requires not only the deprivation but also the acquisition of property." *Sekhar v. United States*, 570 U.S. 729, 734 (2013) (citation and internal quotation marks omitted). So for Hobbs Act extortion, the victim's consent must be to the defendant's receipt of the property for his personal benefit. *See id.* at 736. The inmates knew that Harris took their Green Dot numbers

15

for his personal benefit because Harris told the inmates he did so. Despite this knowledge, the inmates did not report Harris. So the jury could have reasonably inferred that the inmates consented to Harris's receipt of their Green Dot numbers by not reporting him.

Harris argues that the inmates had "obvious motivations" out of self-interest not to report him, but consent for extortion does not require a single-minded decision. Consent may exist even when other factors "weigh[] powerfully" in a victim's decision to give up his property to the extorter. *United States v. Cain*, 671 F.3d 271, 283–84 (2d Cir. 2012). Self-interest is always at play in extortion: the idea behind extortion is that the victim gives up his property so that some worse harm will not befall him. True, if the inmates had reported Harris for taking their Green Dot numbers, they would have necessarily implicated themselves in the illegal scam and for possessing contraband. But that Hobson's choice—even if influenced by self-interested motivations—does not eliminate their consent to Harris's extortion. The inmates still "retain[ed] some degree of choice in whether to comply with the extortionate threat" because they *could* have reported Harris. *Zhou*, 428 F.3d at 371.

Harris points out that no inmate testified that he consented to the taking and argues that the jury could only speculate "[a]s to the thought processes of the unknown inmates," but this argument about evidence the government did not

16

present ignores the evidence that it *did* present. The government presented a recorded interview of Harris in which he confessed that he took Green Dot numbers from inmates and made clear to them that he knew about their ongoing scam. It also presented circumstantial evidence that Harris did not report inmates, and the inmates did not report him. And it presented evidence that inmates did not report officers who confiscated their Green Dot numbers because they did not want their participation in the scheme to come to light. Based on the government's evidence, the jury could have inferred the inmates consented to Harris's obtaining of the numbers. When we view "the evidence in the light most favorable to the jury verdict and draw all inferences in its favor," *Gonzalez*, 834 F.3d at 1214, we must conclude that the government presented sufficient evidence that the inmates consented to Harris's taking.

2.  The Government Proved that Harris Wrongfully Used Fear.

Harris also argues that the government failed to prove a requisite means of extortion, but we again disagree. The jury convicted Harris of both alternative means—that is, extortion by the wrongful use of fear and under color of official right. Because sufficient evidence proved that Harris obtained the inmates' Green Dot numbers by the wrongful use of fear, we need not address whether sufficient evidence also proved that he did so under color of official right.

17

The first of the alternative means of Hobbs Act extortion occurs when a defendant obtains another person's property "induced by wrongful use of actual or threatened force, violence, or fear." 18 U.S.C. § 1951(b)(2). The government must prove the "constituent sub-element" of "the victim's fearful state of mind." *Bornscheuer*, 563 F.3d at 1236. Fear means "a state of anxious concern, alarm[,] or apprehension of harm." *Id.* (citation and quotation marks omitted). It includes "fear of economic loss as well as fear of physical violence." *Id.* (citation and quotation marks omitted). "[I]t is not necessary to show that the defendant caused the fear or made a direct threat" because the government need only "prove that the defendant intended to exploit the fear." *United States v. Flynt*, 15 F.3d 1002, 1007 (11th Cir. 1994). When deciding whether victims were induced to give up their property out of fear, the jury may consider the defendant's reputation. *United States v. Vallejo*, 297 F.3d 1154, 1165 (11th Cir. 2002); *see also United States v. Grassi*, 783 F.2d 1572, 1576 (11th Cir. 1986). As the Second Circuit has explained, a defendant's "[b]ad reputation is relevant to the fear element" because "such a reputation frequently conveys a tacit threat of violence." *United States v. Fazio*, 770 F.3d 160, 165 (2d Cir. 2014) (citation and internal quotation marks omitted).

The government presented sufficient evidence that Harris obtained Green Dot numbers from inmates by the wrongful use of fear. When he confessed to the investigators, Harris acknowledged his reputation as "the asshole" at the prison and

18

explained how he berated inmates during shakedowns when he found Green Dot numbers. He told inmates, "You ain't shit. You's-a lame [sic]. You know I'm fixin' to take your money from you then. . . . How 'bout that?" Harris knew that the inmates tried to avoid him. Indeed, the inmates had a code word for Harris that they would yell when he walked into their block of cells. So the jury could have reasonably inferred that, because of Harris's reputation, the inmates were in a fearful state of mind when he discovered their Green Dot numbers during shakedowns.

The inmates also feared potential punishment. An inmate caught with contraband should have been disciplined immediately by being sent to "the hole"—a punishment of solitary confinement. If the inmates had refused to acquiesce in Harris's extortion, they could have been punished for possessing contraband. The inmates also would have opened themselves up to retribution from the self-described "asshole" for refusing his extortionate scheme. The inmates feared economic harm as well: had their illegal conduct surfaced, their ability to continue their lucrative scam would have been threatened. Sufficient evidence permitted the jury to find that the inmates were in a "state of anxious concern, alarm[,] or apprehension of harm" when Harris shook them down and found Green Dot numbers. *Bornscheuer*, 563 F.3d at 1236.

19

Although he concedes that "[t]he jury could reasonably infer that inmates feared [him] or punishment for their contraband," Harris argues that the jury could not have inferred "that he intended to 'exploit' that fear in taking the Green Dot numbers," but we disagree. To convict Harris of extortion by the wrongful use of fear, the jury had to find that he used fear to induce the inmates' consent to his obtaining of their Green Dot numbers. 18 U.S.C. § 1951(b)(2). "Inducement" is defined as an "act or process of enticing or persuading another person to take a certain course of action." *Inducement*, *Black's Law Dictionary* (10th ed. 2014). The jury could have reasonably found that Harris enticed the inmates to take a certain course of action during a shakedown—permit Harris to take their Green Dot numbers for himself without reporting his misconduct—and that he did so with knowledge of and the intent to exploit their fear of him and of punishment. The jury was "free to choose between or among the reasonable conclusions to be drawn from the evidence." *United States v. Watts*, 896 F.3d 1245, 1251 (11th Cir. 2018). And Harris's jury reasonably inferred that he committed extortion by wrongfully using the inmates' fear.

### B.  The District Court Did Not Violate Harris's Right to Present a Complete Defense when It Limited His Closing Argument.

Harris also contends that the district court abused its discretion and violated his constitutional right to present a complete defense when it prevented him from arguing in closing that, although he might have committed theft, he did not commit

20

extortion. Closing argument is a critical stage of trial. *Hunter v. Moore*, 304 F.3d 1066, 1070 (11th Cir. 2002). It presents "the last clear chance to persuade the trier of fact that there may be reasonable doubt of the defendant's guilt." *Herring v. New York*, 422 U.S. 853, 862 (1975). But "[t]his is not to say that closing arguments in a criminal case must be uncontrolled or even unrestrained." *Id.* A district court "must be and is given great latitude in . . . limiting the scope of closing summations." *Id.* It "may ensure that argument does not stray unduly from the mark, or otherwise impede the fair and orderly conduct of the trial." *Id.*

The Constitution "guarantees criminal defendants a meaningful opportunity to present a complete defense," *Crane v. Kentucky*, 476 U.S. 683, 690 (1986) (citation and quotation marks omitted), but this guarantee does not mean that a defendant can make any argument he desires. *See Mitrovic*, 890 F.3d at 1221 (explaining that "a defendant's right to present a complete defense is not absolute, and is subject to reasonable restrictions"). A district court's "total denial of the opportunity for final argument" violates that right. *Herring*, 422 U.S. at 859. But if the court permits a defendant to present the essence of his desired argument to the jury, his right to present a complete defense has not been prejudiced. *See United States v. Buckley*, 586 F.2d 498, 503 (5th Cir. 1978).

The district court's modest restriction of Harris's closing argument was neither an abuse of discretion nor a violation of his right to present a complete

21

defense. The district court prevented Harris from arguing that he may have committed the specific crime of theft. But it permitted Harris to argue that, although he did something wrong, he did not commit the crime charged in the indictment. Indeed, during closing argument, his counsel argued that Harris may have been guilty of some crime but not the specific crime of extortion. He explained that extortion is not "just stealing or robbing." He later repeated that "extortion is not stealing. Extortion is not robbing. It has more elements." The district court provided Harris an adequate opportunity to present his defense.

A defendant is not entitled "to have the jury choose between the charged offense and an uncharged offense more to his liking" because that choice misconstrues the role of the jury. *United States v. Bradshaw*, 580 F.3d 1129, 1136 (10th Cir. 2009) (explaining that a district court may exclude a closing argument that "would have injected confusion about the actual crime charged"). The jury's role was to decide only whether the government proved that Harris committed extortion, not whether extortion was the correct charge to bring. So the district court did not abuse its discretion when it ruled that Harris's argument that the government should have charged him with theft instead of extortion risked confusing the jury.

If the jury believed that the government's evidence failed to prove extortion, it could have acquitted Harris. It did not. The district court did not err when it

22

exercised its "great latitude" to prevent Harris's closing argument from "stray[ing] unduly from the mark." *Herring*, 422 U.S. at 862.

## IV. CONCLUSION

We **AFFIRM** Harris's conviction.