**NOT FOR PUBLICATION**

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 24-10533
_____

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*versus*

JUAN MARTINEZ,

*Defendant-Appellant.*

_____

Appeal from the United States District Court
for the Southern District of Georgia
D.C. Docket No. 4:22-cr-00170-RSB-CLR-1
_____

Before JORDAN and LAGOA, Circuit Judges, and COVINGTON,* District Judge.

COVINGTON, District Judge:

Juan Martinez appeals his conviction and sentence for conspiracy to steal trade secrets, in violation of 18 U.S.C. § 1832(a)(5). He contends that the district court erred in prohibiting him from raising legal impossibility in his closing argument. Martinez also argues that the court erred at sentencing by considering intended loss in enhancing his offense level, and estimating the intended loss amount based on insufficient evidence. After careful review, we affirm.

## I.

In 2017, Martinez became involved with APAC Airplane Design Consulting, LLC ("APAC"), a start-up company developing a new technology to prevent ice from forming on airplane wings. In October 2017, Gilbert Basaldua, then a contractor of Gulfstream Aerospace Corporation ("Gulfstream"), arranged a meeting between APAC and Gulfstream to explore potential collaboration between the companies. Unbeknownst to Gulfstream, Basaldua had personal involvement and financial interests in APAC.

Following that meeting, Gulfstream and APAC executed a Proprietary Information Agreement (the "PIA") governing the

---

* Honorable Virginia M. Covington, United States District Judge for the Middle District of Florida, sitting by designation.

exchange of confidential information between the companies. Section 4A of the PIA provided:

> The Receiving Party will: (i) use PROPRIETARY INFORMATION solely in furtherance of the Permitted Purpose with the Disclosing Party; (ii) limit disclosure of PROPRIETARY INFORMATION to its' [sic] employees, contract personnel and consultants who are bound by and have been made aware of the restrictions contained herein concerning the use of the PROPRIETARY INFORMATION and who have a "need to know" in order to carry out their respective functions in connection with the Permitted Purpose.

Section 1 of the PIA defined the "Permitted Purpose" as:

> [T]he purpose of exchanging technical information and proposals related to the wing leading edge components and Installation for power consumption for potential use on the G650 aircraft.

Section 15 of the PIA further designated Meghan Wright on behalf of Gulfstream and Tony Chee, Craig German, and Joseph Pascua on behalf of APAC as "the specific points of contact for disclosing and / or receiving written PROPRIETARY INFORMATION transmitted between the Parties."

After executing the PIA, Gulfstream and APAC exchanged proprietary information. Ultimately, in January 2018, Gulfstream

notified APAC that Gulfstream would not be pursuing APAC's anti-icing technology on the G650 aircraft.

Martinez became involved with APAC as the company was pitching its anti-ice technology to various aircraft companies. Eventually, APAC decided that it needed to obtain certification for its anti-ice system from the Federal Aviation Administration ("FAA"). To that end, APAC sought to test its anti-ice technology in a wind tunnel. APAC asked Martinez to develop a plan for a wind tunnel test of an airplane wing that APAC would obtain and equip with APAC's technology. APAC eventually found a Gulfstream wing to use as the test article.

To develop the wind tunnel test plan, Martinez requested various Gulfstream documents from Basaldua. Basaldua emailed Gulfstream's documents from his Gulfstream email account to his own personal email account and then emailed the documents from his personal account to Martinez's personal email account. On at least one occasion, Basaldua emailed Martinez a Gulfstream document from his personal email account and said, "guard this, my job depends on it." On multiple occasions, Basaldua named the subject matter of the emails and the attachments containing Gulfstream's proprietary documents as "Time Card" even though the emails and attachments did not contain timecard information.

Martinez admitted that he received such emails "on a fairly routine basis," acknowledged the attachments contained Gulfstream's trade secrets, and conceded that he and Basaldua used "tradecraft" methods to disguise proprietary information when

emailing it. Martinez also admitted that he knew Basaldua had a financial interest in APAC, and that Basaldua had not disclosed that interest to Gulfstream.

Martinez further admitted that APAC intended to use the wind tunnel test as a proof of concept of APAC's technology so that APAC could market the technology to various aircraft manufacturers, including Gulfstream's competitors. Indeed, Martinez later told law enforcement agents that "the reason APAC wanted this Gulfstream data was simply to get its FAA-certified data so it could market the anti-ice project to numerous aircraft companies." He conceded that if APAC had successfully developed a proof of concept, Gulfstream's competitors might have bought the technology. Martinez also admitted that he sent Gulfstream's proprietary data to numerous people who he knew had no right to view or use that data. For instance, Martinez sent APAC's test plan to a friend and asked him to "wordsmith" the plan so that it did not look as though it contained Gulfstream information.

After Gulfstream received an anonymous complaint, law enforcement confronted Basaldua about APAC's activities. On November 30, 2018, agents arranged for Basaldua to make a recorded phone call to Martinez. During and after that phone call, Martinez and Basaldua agreed to remove the evidence of APAC's use of Gulfstream's proprietary information. However, removing all of Gulfstream's proprietary information was impossible. Martinez knowingly left certain Gulfstream trade secret information in the FAA test plan even though "at that point [he]

knew something was wrong and that [Basaldua] might have stolen it." In December 2018, Martinez sent Tony Chee a wind test plan that contained Gulfstream's proprietary data, which APAC submitted to the FAA.

Martinez was indicted on November 2, 2022, for one count of conspiracy to steal trade secrets. At trial, Martinez moved for a judgment of acquittal, arguing that he could not have conspired to steal Gulfstream's trade secrets. According to Martinez, the PIA authorized him, through his affiliation with APAC, to use Gulfstream documents to develop a wind-tunnel test plan for APAC's anti-ice system. Martinez framed this argument as "legal impossibility," stating that even if the conspirators had achieved their objective, no crime could have resulted. The court denied the motion, characterizing Martinez's argument as one of "factual impossibility." Later, the government moved to preclude Martinez's counsel from arguing the legal impossibility defense in closing, which the court granted. Specifically, the court ruled that Martinez could argue in closing "that he believes the PIA authorized defendant and his alleged co-conspirators to access the documents," but that "defense counsel may not argue to the jury that if the jury finds that the PIA authorized the members of APAC to access the documents, then the jury must find the defendant not guilty, or any similar argument."

Martinez was found guilty by a jury in August 2023. Martinez filed a motion for new trial, again raising the legal impossibility argument, which was denied by the court.

At sentencing, Martinez objected to a sentence enhancement proposed in the probation officer's presentence investigation report, claiming that the enhancement was based on an "intended loss" amount that was unsupported by sufficient evidence. The court heard arguments on the calculation of the loss amount itself and whether the court could rely on an intended loss calculation for sentencing purposes.

During the sentencing hearing, the government called Gulfstream's senior financial manager, Tara Rothermel, as an expert witness. Rothermel testified that APAC claimed its technology would reduce aircraft weight by 550 pounds, and that such a reduction would be a "huge competitive advantage" to Gulfstream's competitors. Rothermel further testified that such an advantage would reasonably result in Gulfstream selling at least three fewer aircraft. Rothermel also testified that the average sale price of a Gulfstream plane was about $65 million, and that Gulfstream's profit margin on such a sale would be about 20 to 25 percent.

The court then issued its rulings. First, the court ruled that the term "loss" in Sentencing Guideline § 2B1.1(b) was ambiguous, and thus it could consider "intended loss" as described in the commentary. Second, the court turned to the calculation of the intended loss amount. The court explained that, although in another coconspirator's sentencing the court had found that profit from three planes was a reasonable intended loss amount, the court determined Martinez was less culpable. Still, the court found

that "anyone in [Martinez's] position" could have foreseen Gulfstream selling at least one fewer plane. The court thus adopted Rothermel's testimony about the amount of lost profit on one plane, rather than three planes. Accordingly, the court calculated the intended loss to be more than $9.5 million but less than $25 million, which it deemed to be "conservative and somewhat lenient to the defendant." On that basis, the court applied a 20-level enhancement under U.S.S.G. § 2B1.1(b)(1)(k), resulting in a total offense level of 26 and an advisory guidelines range of 63 to 78 months.

Ultimately, the court sentenced Martinez to 63 months' imprisonment. In doing so, the court emphasized that it would impose the same sentence "regardless of what the guidelines said," and "regardless of the loss amount," because Martinez's conduct was "extremely serious." Still, the court acknowledged Martinez's remorse, history, characteristics, and low risk of recidivism in "landing at the bottom end of the guideline range."

## II.

"[W]e review a restriction on closing argument for abuse of discretion." *United States v. Harris*, 916 F.3d 948, 954 (11th Cir. 2019). "'Absent a showing of an abuse of discretion the district court will not be reversed for limiting summation as long as the defendant has the opportunity to make all legally tenable arguments that are supported by the facts of the case.'" *Id.* (quoting *United States v. Gaines*, 690 F.2d 849, 858 (11th Cir. 1982)). "Although we review a restriction on closing argument for abuse of discretion, we review

*de novo* constitutional questions." *Id.* (citing *United States v. Mitrovic*, 890 F.3d 1217, 1220 (11th Cir. 2018)).

"We review *de novo* the interpretation and application of the Sentencing Guidelines." *United States v. Cingari*, 952 F.3d 1301, 1305 (11th Cir. 2020).

"[W]e review the district court's loss determination only for clear error." *United States v. Moss*, 34 F.4th 1176, 1190 (11th Cir. 2022) (quoting *United States v. Bazantes*, 978 F.3d 1227, 1249 (11th Cir. 2020)). "A district court need not make a precise determination of loss amount, but only a reasonable estimate of it given the available information." *Id.* "The estimate must be based on 'reliable and specific' facts, and the court cannot 'speculate about the existence of facts that would result in a higher sentence.'" *Id.* (quoting *United States v. Moran*, 778 F.3d 942, 973 (11th Cir. 2015)). "Instead, it must make factual findings about the loss amount 'based on evidence heard during trial, undisputed statements in the PSI, or evidence presented during sentencing.'" *Id.* (quoting *Moran*, 778 F.3d at 973).

## III.

### A.  Legal Impossibility

First, Martinez contends the district court erred by precluding defense counsel from arguing in closing that the PIA authorized Martinez's use of Gulfstream documents, rendering the charged crime legally impossible.

We recognize that, in certain cases, the doctrine of legal impossibility can be a defense to the charge of conspiracy. *See*

*Johnson v. United States*, 158 F. 69, 71–74 (5th Cir. 1907) (reversing a conviction where a bankruptcy trustee was charged with conspiring with the bankrupt to conceal assets "from his trustee," holding that the charge was legally impossible because one cannot conceal property from oneself). Furthermore, pure legal impossibility can, in certain cases, negate the *mens rea* of the defendant charged with conspiracy. *See* Wayne R. LaFave, *Criminal Law* § 12.4, 687 (5th ed. 2010).

However, the district court may properly preclude a legal impossibility argument if the facts do not support it. *See Harris,* 916 F.3d at 954. Indeed, the court "may ensure that argument does not stray unduly from the mark, or otherwise impede the fair and orderly conduct of the trial." *Id.* at 959 (quoting *Herring v. New York*, 422 U.S. 853, 862 (1975)). Relatedly, a criminal defendant must make a "threshold showing" of evidence to assert a defense at the close of trial. *See United States v. Bailey*, 444 U.S. 394, 416 (1980). In other words, while a criminal defendant has the right to have a jury resolve disputed factual issues, where the evidence, even if believed, does not support the proposed defense theory, the trial court need not submit the defense to the jury. *See United States v. Middleton*, 690 F.2d 820, 826 (11th Cir. 1982) (holding that the judge "decides whether the facts constituting the defense framed by the proposed charge, if believed by the jury, are legally sufficient to render the accused innocent").

The crux of Martinez's legal impossibility argument is that the PIA supposedly authorized him to possess and use Gulfstream's

trade secrets. The district court correctly found otherwise. In denying Martinez's motion for new trial, the court found that (1) the Gulfstream documents underlying the charges were not disclosed pursuant to the PIA, and (2) Martinez and his coconspirators agreed to use Gulfstream's documents for purposes not permitted by the PIA. Our review of the record and the PIA confirms these findings.

First, Martinez's possession and use of Gulfstream's documents were not authorized by the PIA because Martinez was unaware of the PIA. Martinez unpersuasively urges that "it does not matter whether [he] in fact relied on the PIA, or ever read it." Yet, Section 4A of the PIA specified that Gulfstream's proprietary data could only be disclosed to certain individuals "who are bound by and have been made aware of the restrictions contained herein." Because Martinez was not aware of the PIA, any disclosures to him could not have been authorized by the PIA. Further, any purported impossibility flowing from the PIA could not have been probative of Martinez's *mens rea*.

Second, Martinez and APAC used Gulfstream's trade secrets for purposes beyond those permitted by the PIA. Section 1 of the PIA limited the permitted purpose to evaluating APAC's system "for potential use on the G650 aircraft." Counsel for Martinez conceded that there was evidence that "APAC, as a company, [and] those who were entitled to act on behalf of APAC, contemplated and perhaps took steps towards using the documents for things other than just potential use on the G650." Further, Martinez

knowingly left Gulfstream's trade secret information in the wind tunnel test plan that APAC submitted to the FAA, months after Gulfstream had ended its consideration of APAC's system. Because Martinez obtained and used Gulfstream trade secrets for purposes not permitted by the PIA, the disclosures to him from which he obtained and used Gulfstream trade secrets could not have been authorized by the PIA.

Third, Martinez himself admits that Gulfstream did not disclose to APAC the trade secrets underlying the charges. Instead, Basaldua took that information from Gulfstream and shared it with Martinez. Though Basaldua was a contractor of Gulfstream, Basaldua was not operating under the authority of Gulfstream or the PIA when he sent Gulfstream's trade secrets to Martinez. Section 15 of the PIA specifies that Meghan Wright was the only party authorized to disclose proprietary information to APAC on behalf of Gulfstream. Accordingly, the documents that Martinez received from Basaldua could not have been authorized by the PIA.

In short, the facts do not support Martinez's argument. The PIA did not authorize the disclosures to Martinez, and Martinez used Gulfstream trade secrets for purposes not permitted by the PIA. Thus, under either an abuse of discretion or *de novo* standard of review, the district court did not err by precluding defense counsel from arguing legal impossibility in closing.

## B. Sentencing

Next, Martinez challenges his sentence on two grounds. First, he argues that actual loss, not intended loss, is the applicable

standard for calculating the loss amount under the Sentencing Guidelines. Second, he contends that the district court erred by calculating his intended loss based on supposedly insufficient evidence. Both arguments fail.

*1.*

First, Martinez challenges the court's use of intended loss to calculate his loss under U.S.S.G. § 2B1.1(b)(1).

On November 1, 2024, the Sentencing Commission adopted Amendment 827 to U.S.S.G. § 2B1.1(b)(1), moving Application Note (3)(A), which states that "loss" under the guideline "is the greater of actual loss or intended loss," from the Commentary to the main text. U.S.S.G. App. C, Amend. 827 (2024). Recently, this Court held that Amendment 827 applies to cases pending on direct appeal because it "is a clarifying amendment." *United States v. Horn*, 129 F.4th 1275, 1300 (11th Cir. 2025). We reasoned that the Amendment simply "maintains the same longstanding approach for calculating loss used in this Circuit's case precedent." *Id.* at 1301. "[T]he Guidelines already unambiguously say that loss is the greater of actual or intended loss, and Amendment 827, a clarifying amendment [], makes that conclusion even clearer." *Id.*

Under this precedent, we conclude that the district court correctly included intended loss, not merely actual loss, in its calculation.

*2.*

Second, Martinez contends that the district court's loss calculations lacked a sufficient evidentiary basis. Martinez argues that the court's intended loss calculation was based on a "chain of assumptions" that never occurred, and that no evidence supported the court's calculation of intended loss as Gulfstream's lost profit from the sale of one plane.

As an initial matter, Martinez criticizes the court's intended loss calculation as depending on a series of "counterfactual" assumptions. But the Sentencing Guidelines at the time of sentencing specified that intended loss "includes intended pecuniary harm that would have been impossible or unlikely to occur." U.S.S.G. § 2B1.1(b)(1) cmt. n.3(A). Accordingly, the court did not err in its intended loss calculation on this basis.

Upon review, we find that the district court made a reasonable estimate of intended loss based on evidence presented at trial and at sentencing.

First, based on Martinez's own testimony at trial, the court determined that Martinez entered the conspiracy with the intention to reduce Gulfstream's market share. Specifically, Martinez testified on cross-examination that APAC planned to use Gulfstream's proprietary information in developing APAC's wind tunnel test so that APAC could obtain FAA certification for its anti-ice technology and market that technology to Gulfstream's competitors.

Second, the court estimated that, had Martinez's conspiracy succeeded, the reduction in Gulfstream's market share would have been the loss of the sale of at least one plane. The court based that estimate on the testimony of the government's expert witness, Rothermel, at sentencing. Specifically, Rothermel testified that, if APAC developed technology that reduced aircraft weight by 550 pounds, such technology would have given Gulfstream's competitors a "huge competitive advantage." Rothermel testified that it would be reasonable to assume that Gulfstream would have sold at least three fewer planes had the conspiracy succeeded. The court used a more "lenient" estimate of one plane, rather than three. Rothermel further testified that in 2018 the average sale price of a Gulfstream plane was about $65 million.

Third, the court estimated that Gulfstream's profit margin on the sale of one plane would have been between $9.5 million and $25 million. Again, the court based that estimate on Rothermel's testimony. Rothermel testified that, on the sale of a $65 million aircraft, Gulfstream's profit margin is approximately 20 to 25 percent. Moreover, Martinez did not object to the court's finding, based on Rothermel's testimony, that the estimated lost profit from the sale of one fewer plane would have been between $9.5 million and $25 million. Furthermore, the court's finding on lost profit aligns with Rothermel's testimony (i.e., 20 percent of $65 million is $13 million, which falls within the range found by the court).

Accordingly, the district court did not clearly err in calculating Martinez's intended loss. The court made a reasonable

estimate of Martinez's intended loss "given the available information," and based that estimate on "evidence heard during trial . . . [and] evidence presented during sentencing.'" *Moss*, 34 F.4th at 1190 (citation omitted).

## IV.

For the foregoing reasons, we affirm Martinez's conviction and sentence.

**AFFIRMED.**